Albert J. EDMONDSON, Ex Parte
*v.* D. R. EDMONDSON et al

CA 80-39                                    599 S.W. 2d 765
Court of Appeals of Arkansas
Opinion delivered May 28, 1980
Released for publication June 18, 1980

*Alan D. Epley*, for appellant.

*Sam T. Heuer*, for appellees.

Steele Hays, Judge. This is a family dispute over the ownership of a certain tract of land in Carroll County. In 1966 Charlie Edmondson died intestate leaving eleven children to survive him. Appellant, Albert J. (Jack) Edmondson, who is one of the deceased's children, had lived with his father and had taken care of the "homeplace" since his discharge from the Army in 1946. Dick Edmondson, his oldest brother, also worked on the farm during that time. Upon Mr. Edmondson's death, both Dick and appellant Jack made arrangements to obtain quitclaim deeds from the .other children of their interest in the property. There was testimony at the trial to indicate that the deceased father had expressed a desire to give the property to appellant. Appellant had testified that Dick had made all the arrangements with the other children, but three of the

children testified that appellant had discussed the matter with them before they signed the quitclaim deed.

In 1967, nine of the children quitclaimed their interest in the property to appellant. One sister, Susie Alvard, sold her interest to appellant for a valuable consideration of $2,272.72.

In 1978, appellant filed an action to quiet title to the tract of land in question which consisted of approximately 172 acres. Appellees, the other surviving children of Charles Edmondson and their heirs, filed a response to the petition to quiet title. They also counterclaimed on the basis that the quitclaim deed was procured by fraud and that there existed a confidential relationship between appellant and the other heirs of Charles Edmondson. Furthermore, they alleged that appellant orally promised that he would hold the property and upon the sale of such property, he would divide the proceeds among the heirs. As a result of this alleged oral promise, petitioners contended that a constructive trust should be declared on any proceeds obtained from the sale of such property.

The Chancellor rendered a decision against appellant, stating that he had failed to prove by a preponderance of the evidence that title should be quieted in his name. Furthermore, the Chancellor held in favor of the counter-petitioners (appellees), stating that they had shown by clear and convincing evidence that the dispute property was conveyed to appellant for use during his lifetime and was to be divided among all the heirs at his death. Appellant brings this appeal from the judgment below.

Appellant alleges five points for reversal which can be narrowed down to one central issue — namely, whether a constructive trust should be imposed upon the disputed property in favor of the other heirs of Charles Edmondson.

We find the facts in this case to be similar in many respects to the facts in *Walker* v. *Biddell*, 225 Ark. 654, 284 S. W. 2d 840 (1955). In *Walker, supra,* appellant obtained quitclaim deeds from his two sisters to 320 acres of land held by their family for many years. One sister and the other

sister's heirs brought suit to have the quitclaim deeds cancelled, contending that they had merely executed the deeds to appellant to make it easier to execute oil-and-gas leases on the property. Appellant contended that he had always owned the property, that he had put the property in the name of his two sisters to avoid the possibility of a judgment creditor levying on the property, and that the two sisters simply reconveyed the property back to appellant when the claim was paid.

The Walker children had inherited the land from their father and had lost it in a foreclosure proceeding twenty years later. Title was regained when one Henry Stevens conveyed the property to appellant's wife and his two sisters. It remained that way until appellant's two sisters quitclaimed their interests in the property to him. On appeal, the Arkansas Supreme Court found that appellees had met their burden of showing by clear and convincing evidence that the deeds in question were made in reliance upon appellant's oral promise to hold the land for himself and his sisters. The court specifically adverted to a letter written by appellant to one of the sisters recognizing her interest in the property and assuring her that he was not taking it from her. This evidence considered with the other testimony was enough to meet the burden of proof. The court also held that the statute of frauds does not apply to a constructive trust. A constructive trust will arise when the grantee's oral promise to hold property for the grantor is fraudulently made or when a promise is given by a grantee who stands in a confidential relation to the grantor. *Armstrong* v. *Armstrong*, 181 Ark. 597, 27 S.W. 2d 88 (1930); Restatement, *Trusts* § 44.

In the instant case, all of these factors are present that were stated in the *Walker* case. Three of Charles Edmondson's descendents testified that appellant had made an oral promise to hold the property for the benefit of himself and the grantors and if he ever sold the property, the proceeds would be divided among the heirs. This evidence was corroborated by a letter (Defendant's exhibit #1) written by appellant to appellee, Leva Summers, which stated in part:

Well, Sis, we have gotten everything fixed up on the homeplace, had to pay Susie off at $25,000 making her $2,273. I paid her by *she is out now am going to fix it so you or your children will get your one ninth part in time, don't know just when . . .* (Tr. 141) (Emphasis added).

Also, appellant's testimony indicates that some promise or agreement was made at the time the heirs quitclaimed their interest in the property to appellant and that he later changed his mind about following through with the agreement:

"Q. Why did you change your mind, Mr. Jack?

A. I didn't change my mind.

Q. You never have changed your mind?

A. I did after she filed this outfit and broke the promise.

Q. After she filed the outfit and broke the promise. Now, you tried to quiet title where you could sell it first, didn't you, Sir?

A. Some of the deeds was in pretty much of a mess. I tried to get 'em straightened out.

Q. Well, I haven't seen those messes, but that's alright. So you decided that after she filed against this quiet title that you wouldn't give them nothing. Is that your testimony?

A. I decided I'd give 'em what I wanted 'em to have and who I wanted to have it . . ."

"Q. Do you recall telling me that when you got married that's when you changed your mind?

A. No.

Q. You don't recall that? (T. 135).

A. I recall that, but what caused me to change my mind

was that law changed the situation.

Q. How did the law change the situation, Mr. Jack?

A. I couldn't explain that just exactly.

Q. Did your attorney tell you that?

A. No.

Q. Who told you the law forbids you now to carry out the agreement with these ladies?

A. It's the Dowry Homestead Act.

Q. Dowry Homestead Act won't let you do that now?

A. It gives her an interest in it.

Q. And you decided that when you got married to her?

A. No, I didn't decide that when I got married to her.

Q. When did you decide it?

A. It was on the statutes of the State of Arkansas long 'fore then.

Q. So, at that point, because the State of Arkansas, according to you, would not let you give these ladies their part, you were going to keep it from them?

A. No.

Q. What were you going to do, sir?

A. I went ahead and made another will. My wife signed her dowry part of it over to them and then they went and filed this outfit, so that broke that, and that was that."

Then, later appellant testified:

"Q. And you were going to give each one of the children their one-ninth or one-eleventh part?

A. That's the way I had it fixed 'til they broke it. Had the will fixed up.

Q. I'm not interested in the will.

A. That's what it was.

Q. Until they broke it?

A. That's right.

Q. So they filed your suit and they opposed you, so you decided well, then, they ain't gonna get nothin', is that the way it was?

A. No.

Q. When did you decide?

A. Whenever they broke the promise.

Q. How did they break their promise?

A. By filing these accusations against me."

Clearly, appellant's testimony indicates that he had promised to give the property to the other heirs of Charles Edmondson either at the time of his death or, in the event of a sale of the property, he would divide the proceeds. This evidence, taken together with the letter by appellant to his sister and the testimony of the appellees provides clear, cogent and convincing evidence that the quitclaim deed was executed in reliance upon appellant's oral promise to hold the land for himself and the other heirs of Charles Edmondson. *Walker, supra; McCombs* v. *McCombs,* 227 Ark. 1, 295 S.W. 2d 775 (1956); *McNutt* v. *Carnes,* 213 Ark. 346, 210 S.W. 2d 290 (1948).

Even in the absence of a promise which is fraudently

made, the court can impose a constructive trust when a promise is given by a grantee who stands in a confidential relation to the grantor. *Henry* v. *Goodwin*, 266 Ark. 95, 583 S.W. 2d 29 (1979); *Walker* v. *Biddle, supra*; Restatement, Second, *Trusts*, § 45. The relationship between brothers and sisters is, in the absence of fraud, one of confidence; they are not deemed to be dealing with each other at arm's length. *White* v. *White*, 254 Ark. 257, 493 S.W. 2d 133 (1973); *Walker* v. *Biddle, supra*; *Armstrong* v. *Armstrrong*, 181 Ark. 597, 27 S.W. 2d 88 (1930). Hence, in the instant case, appellant, to some extent, stood in the fiduciary relationship to his brothers and sisters. There is no requirement to show that appellant's promise was fraudently made. It is enough to show that appellant made an oral promise and that he stands in a confidential relationship to the grantee. In this case, these factors have been shown by clear, cogent and convincing evidence and therefore appellees have met the test for establishing a constructive trust. *Bottenfield* v. *Wood*, 264 Ark. 505, 573 S.W. 2d 307 (1978); *Robertson* v. *Robertson*, 229 Ark. 649, 317 S.W. 2d 272 (1958). However, three heirs of Charles Edmondson indicated that when they quitclaimed their interest to appellant, they did not rely on any oral promise of appellant to hold the property in trust. Paul Edmondson testified at trial that he gave up all interest in the property when he signed the quitclaim deed, and that no promise was made to turn it back to him at any time. Also, Wendell Edmondson testified that he did not know of any oral promise made by appellant to give the property back to the heirs at the time of appellant's death or at the sale of the property. Finally, Lola Pierpont, prior to trial, wrote appellant two letters renouncing any interest in the property. The letter dated September 20, 1979, stated in part:

> I thought of writing another letter saying I had give my share of the place to you and having it notarized for you. Floyd didn't think it was necessary since I had already sent one to you. (T. 126).

The letter dated October 20, 1978, states:

> Now, we gave you our part of the place some years ago and it is yours. (T. 127)

Clearly, these three heirs did not rely on any oral promise given by appellant. Furthermore, it was their understanding that they gave up their entire interest in the property. We hold that the constructive trust does not benefit their heirs since they stated that, at no time, did they rely on any oral promise of appellant and, in fact, expressed an intention to give up their share of the property.

Hence, the ruling of the Chancellor is modified to the extent that the constructive trust will not benefit those heirs who have declared that they have no interest in the property and did not rely on any oral promise made by appellant; namely, Paul Edmondson, Wendell Edmondson and Lola Pierpont. Title is quieted in appellant's name to five-elevenths of the disputed property. Appellant holds title to the remaining six-elevenths as trustee of a constructive trust to benefit the remaining heirs of Charles Edmondson as divided by the Chancellor.

Affirmed as modified.